# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Steven and Cecilia Thunander, on behalf of themselves and all others similarly situated, | Civil No. 11-2322 (SRN/SER) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Uponor, Inc., a successor to Uponor North America, Inc. and Uponor Wirsbo, Inc., and Weil-McLain, a Division of the Marley Wylain Company, | |
| Defendants. | |

---

Robert K. Shelquist, Lockridge, Grindal, Nauen, PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota 55401; Shawn M. Raiter, Larson King, LLP, 30 East Seventh Street, Suite 2800, Saint Paul, Minnesota 55105, for Plaintiffs.

Daniel W. Berglund, Grotefeld, Hoffman, Schleiter, Gordon & Ochoa, LLP, 150 South Fifth Street, Suite 3650, Minneapolis, Minnesota 55402; Howard L. Lieber and Kathleen A. Reid, Grotefeld, Hoffman, Schleiter, Gordon & Ochoa, LLP, 311 South Wacker Drive, Suite 4500, Chicago, Illinois, 60606; Jonathan J. Tofilon, Grotefeld, Hoffman, Schleiter, Gordon & Ochoa, LLP, Geneva, Illinois 60134, for Defendant Uponor, Inc.

Gary M. Hansen, Meghan M. Anzelc, Patrick M. Fenlon and Heidi A.O. Fisher, Oppenheimer, Wolff & Donnelly, LLP, 222 South Ninth Street, Suite 2000, Minneapolis, Minnesota 55402, for Defendant Weil-McLain

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion to Dismiss filed by Defendant Weil-

McLain [Doc. No. 13] and the Motion to Dismiss filed by Defendant Uponor, Inc. [Doc.

No. 16].  For the reasons stated below, the Court grants the Motions to Dismiss and

dismisses the Complaint [Doc. No. 1] with prejudice.

## I.    BACKGROUND

In this putative class action, Plaintiffs, who are Indiana residents, allege that they

purchased a home in Michigan City, Indiana that contained a defective potable water

plumbing system.  (Compl. ¶ 80 [Doc. No. 1].)  The house was built in 2002 and

Plaintiffs purchased it in 2007.  (Building Permit, Uponor's Ex. B [Doc. No. 21-1];

Warranty Deed, Ex. A to Aff. of Heidi A.O. Fisher [Doc. No. 27].)  Plaintiffs contend

that Defendant Uponor, a Minnesota corporation, manufactured defective pipe used in

their home's plumbing system.  (Id. ¶ 9.)  Plaintiffs claim that the pipe was

manufactured at Uponor's factory in Zella-Mehlis, Germany for Defendant Weil-McLain,

which sold the pipe under the AlumiPex brand.  (Id. ¶¶ 9; 39.)  Uponor also sold the pipe

in the United States under the trade name Multicor.  (Id. ¶ 38.)  Plaintiffs contend that

"pex" is the acronym for cross-linked polyethylene, a component in the pipe in question.

(Id. ¶ 32.)  The pipe is commonly referred to as "pex-al-pex" pipe, which refers to an

inner layer of pex, a layer of aluminum, and an outer layer of pex.  (Id. ¶ 34.)  Plaintiffs

contend that Defendants marketed, distributed and sold the AlumiPex and Multicor

plumbing systems in the United States.  (Id. ¶ 14.)

According to the Complaint, plumbing components that are to be used for potable

water systems in the United States must be approved and listed for such use by the

National Sanitation Foundation ("NSF").  (Id. ¶ 10.)  Plaintiffs allege that while pex-al-

pex was primarily used in the past for radiant heating applications, Uponor obtained a dual NSF listing for both potable water and radiant heating applications for its pipe, allowing it to be used for both purposes.  (Id. ¶¶ 35; 36.)  Plaintiffs also allege that while Uponor's plumbing systems, including pipe, were manufactured and marketed by Uponor as being in compliance with NSF standards, for use in potable water systems, the pipe did not actually meet NSF standards. (Id. ¶ 11.)  Rather, Plaintiffs allege, Uponor fraudulently obtained NSF approval by submitting different, specially produced samples of pipe to NSF for testing.  (Id.)  In actual production, however, Plaintiffs allege that  "Uponor used a different pipe formulation which did not and could not have met the toxicity requirements for NSF approval."  (Id.)  The Thunanders describe Uponor's actions as a "classic bait and switch" scheme by which Uponor falsely obtained the NSF approval for the use of their pipes in potable water plumbing systems.  (Id.)

Plaintiffs allege that this bait and switch scheme was discovered in early 2003 when NSF representatives made an unannounced visit to Uponor's German manufacturing facility.  (Id. ¶ 12.) Testing pipe from Uponor's actual production line, the NSF representatives found that the pipe failed NSF 61 toxicity requirements for potable water use.  (Id.)  The Thunanders contend that Uponor's management concealed this scheme from the NSF.  (Id. ¶ 15.)   In addition, the Thunanders contend that Uponor failed to inform homeowners, plumbers and consumers that it had been selling pipe that failed to meet NSF toxicity requirements at the time of sale and installation.  (Id. ¶ 16.) Plaintiffs contend that NSF requested a second set of pipe samples in August 2003,

which, Uponor internally conceded, would also not meet the NSF 61 standard.  (Id. ¶¶ 46; 52.)

Plaintiffs allege that Uponor's "scheme of fraud and deceit" was documented in a September 4, 2003 memorandum from Uponor employee Jens Schuell to Uponor corporate management, including current Executive Vice President and Executive Committee Member Heiko Folgmann.  (Id. ¶ 17; Schuell Memo, Ex. B to Aff. of Shawn Raiter in Opp'n to Uponor Mot. [Doc. No. 26-1].)  In the memo, Mr. Schuell notes that NSF withdrew its approval for Uponor's pipe fittings a few months earlier, after finding excessive lead content in the fitting material when NSF tested fittings from the production line.  (Schuell Memo ¶ 1, Ex. B to Raiter Uponor Aff. [Doc. No. 26-1].)   Mr. Schuell indicates that the fittings could not be corrected, "because ultimately current production processes do not allow for production of products/fittings that conform to NSF standards."  (Id. ¶ 2.)  Mr. Schuell states that a quality management employee at the production facility traced the problem to the use of a particular catalyst, noting

> that the CONSTAB catalyst had been used in the 1st quarter, which was identified as the source of error.  New pipe samples were produced using the Micropol catalyst.  However, these samples were taken from the actual production and not produced with the "special Tox-PEX" material.

(Id. ¶ 5.)

The memo acknowledges Uponor's past practice of providing separate pipe samples to NSF, produced with a different, special catalyst.  (Id. ¶ 3.)  Mr. Schuell further indicates that following the unannounced NSF visit, Uponor intended to inform NSF that the non-conforming material in question would be changed.  However, until that time,

NSF approval for the pipes' use in potable water systems would be withdrawn.  (Id. ¶ 8.)
The pipes would still be sold for heating applications, without the NSF imprint, as any
toxicity levels would not affect the use of the pipes for that purpose.  (Id.)  The memo
also notes that personnel in Uponor's purchasing department directed that no more of the
products be shipped to North America until further notice.  (Id. ¶ 9.)  Mr. Schuell further
describes several internal quality control steps, including retrieving containers of shipped
pipe, storing the pipes bearing the NSF imprint, and providing a detailed inventory of
pipes.  (Id. ¶ 10.)   Finally, Mr. Schuell notes that "current production processes" at the
German manufacturing facility allow for the production of NSF-conforming pipes "only
in a limited way."  (Id. ¶11.)

Plaintiffs contend that Uponor knew "from other testing and litigation" that its
pipe emitted toxic chemicals, based on a 2002 Arizona lawsuit involving claims that
Uponor's pex pipe emitted high levels of Methyl-tert-Butyl ether, tert-Butyl alcohol and
other benzene compounds.  (Compl. ¶ 55.)  "Uponor's own test documents produced in
that case confirmed the presence of these chemicals in drinking water passed through
Uponor pipes."  (Id.)

Plaintiffs allege that they have been damaged by owning a home with a plumbing
system that does not comply with NSF 61. (Compl. ¶ 86.)  The Thunanders further
contend that their damages include the cost to replace the system and "damage to other
parts of the structure caused by the defective plumbing system."  (Id.)

Plaintiffs seek to assert a class action involving persons who own structures

containing Multicor or AlumiPex pipe used for the delivery of potable water.  (Id. ¶¶ 88-89.)  Plaintiffs plead twelve causes of action.  They assert six statutory claims under Indiana and Minnesota law, including the Indiana Consumer Product Liability Act ("ILPA"), Ind. Code Ann. §§ 34-20, *et seq.* (Count I); the Indiana Deceptive Sales Act ("IDSA"), Ind. Code Ann. § 24-5-0.5-3 (Count IV); the Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. § 325F.69 (Count V); the Minnesota Unlawful Trade Practices Act ("MUTPA"), Minn. Stat. § 325D.13 (Count VI); the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. 325D.44 (Count VII); and the Minnesota False Statement in Advertisement Act ("MFSAA"), Minn. Stat. § 325F.67 (Count VIII). Plaintiffs allege two claims grounded in contract law, i.e., breach of express warranties (Count II) and breach of the implied warranty of merchantability (Count III), and two tort claims, i.e., negligence (Count IX) and negligent failure to warn (Count X).  Plaintiff also assert a claim for fraudulent concealment/equitable tolling (Count XII), alleging that to the extent that any applicable statutes of limitation preclude their claims, Defendants' conduct requires the tolling of such statutes.  Finally, Plaintiffs seek declaratory and injunctive relief (Count XI).  While most of the claims are asserted against both Defendants, Plaintiffs assert their Minnesota statutory claims (Counts V-VIII) against Uponor alone.

## II.   DISCUSSION

Defendants move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) on several grounds.  First, Defendant Uponor argues that Plaintiffs have failed to demonstrate the

requisite "injury in fact" necessary to confer standing.  In addition, Uponor contends that

the expiration of the respective statutes of limitation applicable to Counts II-VIII

mandates dismissal of those claims.  Furthermore, Uponor argues that pursuant to the

economic loss doctrine, Counts I, IX and X should be dismissed.  As to Plaintiffs' claims

which involve an element of fraud (Counts V-VIII, X and XII), Uponor also maintains

that Plaintiffs' Complaint fails to plead those claims with particularity, as required by

Fed. R. Civ. P. 9(b).  Uponor also contends that Plaintiffs' claims involving equitable

relief or application of an equitable tolling remedy (Counts XI and XII) are inadequate

and should be dismissed.  Further, Uponor contends that Plaintiffs' claim for equitable

relief (Count XI) is duplicative of the causes of action alleged and should be dismissed.

Defendant Weil-McLain also argues on various grounds that Plaintiffs' claims fail

as a matter of law.  Weil-McLain asserts many of the same arguments as presented by

Uponor, and further argues that, to the extent Plaintiffs contend that an agency

relationship establishes Weil-McLain's liability, Plaintiffs have failed to plausibly allege

the elements of such a relationship.   Weil-McLain also asserts that Plaintiffs

impermissibly refer to "Defendants" generically in many of their allegations, and the

claims should be dismissed.

### A.    Standard of Review

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the

facts in the Complaint to be true and construes all reasonable inferences from those facts

in the light most favorable to Plaintiff.[1]  Morton v. Becker, 793 F.2d 185, 187 (8th Cir.

---

[1]  The parties have submitted exhibits with their submissions to the Court.  When considering a Rule 12 motion, the court generally must ignore materials outside the pleadings, but it may consider "some materials that are part of the public record or do not contradict the complaint,"  Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir.1999), cert. denied, 527 U.S. 1039 (1999), as well as materials that are "necessarily embraced by the pleadings."  Piper Jaffray Cos. v. National Union Fire Ins. Co., 967 F. Supp. 1148, 1152 (D. Minn. 1997).  See also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1357, at 199 (1990) (court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint").  The Court notes that when a complaint quotes from, or cites to, particular supporting documents, it is good practice to file any such supporting documents as exhibits to the complaint.  This Complaint was filed without any attached exhibits.

The Court here considers the September 4, 2003 Uponor Memorandum from Jens Schuell, submitted by Plaintiffs in the original German and as translated in English, as material necessarily embraced by the pleadings.  (Schuell Mem., Ex. B & C to Raiter Uponor Aff. [Doc. Nos. 26-1].)  The Complaint specifically refers to Schuell's memorandum.  (See, e.g., Compl. ¶ 17.)  Although less clearly identified, the Complaint also refers to a 2002 Weil McLain marketing and sales brochure (id. ¶ 68), which the Court believes is found in Exhibit D to the Aff. of Shawn Raiter in Opp'n to Weil-McLain Mot. [Doc. No. 28-1].  Because the Complaint also references Defendants' express warranties (id. ¶¶ 107-08), the Court will consider the warranty exhibits submitted by the parties.  (Uponor Limited Warranty, Ex. F to Raiter Aff. [Doc. No. 26-1]; Weil-McLain Limited Warranties, Exs. C & D to Fisher Aff. [Doc. Nos. 24-3 & 24-4].)

In addition, the Court considers Weil-McLain's Exhibits A & B [Doc. Nos. 24-1 & 24-2], which are property records related to Plaintiffs' residence, and Uponor's Exhibits B-G [Doc. Nos. 21-1-21-6], which are public records related to Plaintiffs' residence. These records are properly before the Court as matters of public record, see In re K–Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 889 (8th Cir.2002), and the Court takes judicial notice of them.  Defendants offer the records to generally establish relevant dates associated with Plaintiffs' property, and this information does not appear to be contradicted by the Complaint.  The Court's consideration of these materials does not require the Court to treat Defendants' motions as motions for summary judgment. See Enervations, Inc. v. Minn. Mining & Mfg. Co., 380 F.3d 1066, 1069 (8th Cir. 2004).

1986).  However, the Court need not accept as true wholly conclusory allegations, <u>Hanten v. Sch. Dist. of Riverview Gardens</u>, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions Plaintiff draws from the facts pled.  <u>Westcott v. City of Omaha</u>, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 545 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." <u>Id.</u> at 555.  As the United States Supreme Court recently reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under <u>Twombly</u>.  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (citing <u>Twombly</u>, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." <u>Twombly</u>, 550 U.S. at 556.

## B.    Contract-Based Claims

Defendants argue that Plaintiffs' claims for breach of warranty and breach of the implied warranty of merchantability fail to adequately plead the required element of defect, and relatedly, fail to satisfy the element of an injury in fact necessary to confer Article III standing.  In addition, Defendants contend that Plaintiffs' claims are barred by the applicable statute of limitations and that their express warranty claims also fail under Indiana law for lack of privity.  Defendants further argue that there should be no equitable

9

tolling of the statute of limitations on the grounds of fraudulent concealment.

### 1.    Pleading the Element of "Defect"

Plaintiffs allege that the AlumiPex pipes are defective and that Defendants breached an implied warranty of merchantability and express warranties. An implied warranty of merchantability is breached on a showing that a "product is defective to a normal buyer making ordinary use of the product." Driscoll v. Standard Hardware, Inc., 785 N.W.2d 805, 816 (Minn. Ct. App. 2010) (citing Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 53 (Minn.1982)).   Under Indiana law, a good may breach the implied warranty of merchantability if it is defective as the result of an imperfection or dereliction.[2] Irmscher Suppliers, Inc. v. Schuler,  909 N.E.2d 1040, 1048 (Ind. Ct. App. 2009).

The elements of a claim for breach of express warranty are the same under Minnesota and Indiana law.  A buyer seeking to recover for breach of warranty must establish: (1) the existence of a warranty; (2) breach of that warranty; and (3) that the breach caused the alleged harm.  Id.; Daigle v. Ford Motor Co., 713 F. Supp.2d 822, 825

---

[2]  The Court does not find it necessary to address the issue of choice of law in connection with the instant motions, because the laws of Minnesota and Indiana are consistent as to the primary rulings contained in this Order.  To the extent that the laws of Minnesota and Indiana are different with respect to a specific legal claim, such differences are noted, and any such differences arise in the context of alternative bases for this Court's rulings.  In its briefing on the instant motion, Defendant Weil-McLain broadly addressed the issue of choice of law, concluding that Indiana law applies, but did not conduct a choice of law analysis for each separate cause of action.  (Def. Weil-McLain's Mem. at 8-9 [Doc. No. 23].)  Uponor and Plaintiffs did not directly address the issue and cited authority from both jurisdictions.

(Minn. 2010) (citing Minn Stat. § 336.2-313).

Under Eighth Circuit authority, "[c]ourts have been particularly vigilant in requiring allegations of injury or damages in products liability cases." Briehl v. General Motors Corp., 172 F.3d 623, 627 (8th Cir. 1999) (discussing the damage requirement in the context of a complaint that failed to allege a product defect under various theories, including breach of implied warranty and breach of express warranty.)  Specifically, in such cases, a plaintiff must allege a manifest defect. Id. (affirming the dismissal of the plaintiffs' claims due to their failure "to allege any manifest defect.").  In O'Neil v. Simplicity, Inc., a case involving claims for breach of warranty, the Eighth Circuit noted that "[i]t is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own."  574 F.3d 501, 503 (8th Cir. 2009) (citing Briehl, 172 F.3d at 627).  In O'Neil, the plaintiffs alleged that defendants' baby cribs were defective in that the drop side could separate from the crib frame.  They did not allege, however, that such a separation occurred in their crib, a failing that the court found fatal to their claims: "It is not enough to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect." Id. (citations omitted) (emphasis added).  The court characterized the plaintiffs' action as a 'no-injury case,' in that "the O'Neils have attempted to refashion what is at its core a no-injury products liability suit into a suit based on contract." Id.  Because the O'Neil's crib performed as intended, and the alleged

11

defect of drop side separation did not occur with their crib, the court found that there was

no basis for relief.  Id. at 505.

Under Indiana warranty law, "[a]ny action based on breach of warranty requires

evidence showing . . . that the warranty was broken [and] that the breach of warranty was

the proximate cause of the loss sustained." Frantz v. Cantrell, 711 N.E.2d 856, 860 (Ind.

Ct. App.1999).  ". . . There is no requirement that [p]laintiffs demonstrate any injury to

their person or property as a result of the breach, but only that they purchased an

unmerchantable product." In re Bridgestone /Firestone, Inc. Tires Prods. Liability Litig.,

155 F. Supp.2d 1069, 1099-1100 (S.D. Ind. 2001) (holding that allegations containing

facts showing that the tires and vehicles in question were defective was sufficient

pleading of a warranty claim for purposes of surviving a motion to dismiss.)  The

requirement that Plaintiffs demonstrate that they purchased an "unmerchantable product"

requires Plaintiffs to allege sufficient facts supporting the claim that the product is

"unmerchantable" or defective.  This is consistent with Minnesota law, which does not

require a showing of an "injury" to one's person or property as a result of the breach, but

requires credible allegations of defect, namely, a showing that the defendant's allegedly

defective product actually exhibited the alleged defect.  See O'Neil, 574 F.2d at 504-05.

Plaintiffs argue that none of the AlumiPex piping sold by Defendants complies

with NSF 61.  (Pls' Uponor Opp'n Mem. at 9 [Doc. No. 25]) (emphasis in original).

Plaintiffs rely entirely on the Schuell Memo and argue that it provides sufficient support

for their allegations of defect to survive a motion to dismiss.  The Court disagrees.   The

Schuell Memo admits to a bait and switch practice, however, the memo identifies a specific catalyst as the culprit.  The memo, written in September 2003, refers to Uponor's use of the catalyst in "the first quarter," of, presumably, 2003.  The Thunanders' home was built in 2002, at which time the plumbing system with the pipe at issue was presumably installed.  However, the Complaint fails to allege that the suspect catalyst was present in the Thunanders' plumbing system, or that testing revealed the presence of toxins, let alone when the Thunanders' system was manufactured.  Moreover, the Schuell Memo refers to events occurring in 2003, but it does not provide sufficient factual support from which Plaintiffs may extrapolate that all of the AlumiPex and Multicor pipe sold by Defendants, at any point in time, was defective.  "'[I]t is not enough' for a plaintiff 'to allege that a product line contains a defect, or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect.'"  In re Zurn Pex Plumbing Prods. Liability Litigation, 644 F. 3d 604, 616  (8th Cir. 2011) (quoting O'Neil, 574 F.3d at 503-04).

Here, the Thunanders simply allege that their piping is at risk for manifesting a defect.  Had the Thunanders' Complaint alleged that they had tested their pipes and found that their plumbing system contained the defective pipe referenced in the Schuell Memo, they might have pled "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 545.  But counsel confirmed, at oral argument, that no testing of the Thunanders' pipes was done.  While Plaintiffs also allege that Uponor knew that its pex pipe contained "toxic chemicals" based on a lawsuit in Arizona (Compl. ¶ 55), once

13

again, the Thunanders do not allege that their own pipes have been tested and

demonstrate toxicity or lack of compliance with the NSF 61 standards. Moreover, the

Complaint itself impliedly concedes Plaintiffs' failure to test, as they seek declaratory

relief requiring Defendants to "instruct[] them on how to test the piping and water to

determine the level of risk, and to initiate testing to determine the scope and extent of risk

. . . ." (Compl. ¶¶ 147; 158.)

In the absence of any testing of the Thunanders' pipes, Plaintiffs are unable to

allege sufficient facts to plausibly establish that their pipes are in fact defective or non-

merchantable. The Court finds that under either Minnesota or Indiana law, Plaintiffs'

warranty claims (Counts II and III) fail as a matter of law and must be dismissed.

Pursuant to Rule 12(b)(6), Plaintiffs fail to allege facts supporting their allegation of

defect or the "merchantable" quality of the AlumiPex pipes. Although this finding is

dispositive of Plaintiffs' warranty claims, the Court nevertheless addresses Defendants'

additional arguments for dismissal of these claims. The Court turns next to the question

of standing.

### 2.    Standing

The doctrine of standing limits the courts' jurisdiction to "those disputes which are

appropriately resolved through the judicial process." Lujan v. Defenders of Wildlife, 504

U.S. 555, 560 (1992). To have standing under Article III of the Constitution, a plaintiff

must demonstrate the existence of an actual case or controversy by showing (1) a concrete

injury in fact, (2) that is fairly traceable to the challenged action, and (3) that is likely to

be redressed by the relief sought.  See id., 504 U.S. at 560–61.  The party invoking

standing must demonstrate an injury in fact of a legally protected interest that is both (a)

concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.

Republican Party of Minn. v. Klobuchar, 381 F.3d 785, 791-92 (8th Cir. 2004).

      In response to Defendants' standing argument, Plaintiffs argue, from a procedural

standpoint, that any determination of standing is premature prior to class certification.

(Pls' Mem. Opp'n to Weil-McLain at 28 [Doc. No. 27].)  In support of their position,

Plaintiffs cite to Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1999), and Ortiz v.

Fibreboard Corp., 527 U.S. 815 (1999), for the proposition that class certification is

"logically antecedent" to questions of standing.  (Id.) (citing Amchem, 521 U.S. at 612.)

In both Amchem and Ortiz, however, the standing issue was raised as to one sub-class of

plaintiffs – not all plaintiffs.  It was in this context, as to a particular sub-class, that the

Supreme Court deferred resolution of standing, prior to resolution of the dispositive issue

of class certification.  Amchem, 521 U.S. at 612; Ortiz, 527 U.S. at 831.  In Ortiz, the

Supreme Court acknowledged that "[o]rdinarily, of course, this or any other Article III

court must be sure of its own jurisdiction before getting to the merits."  Ortiz, 527 U.S. at

831 (quoting Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)).   Even

though the Court dealt with class certification first, it did so "mindful that Rule 23's

requirements must be interpreted in keeping with Article III constraints. . . . " Amchem,

521 U.S. at 612–613; Ortiz, 527 U.S. at 831 (quoting Amchem).

      Here, there are two plaintiffs – the Thunanders – and no other current class

members.  The question of the Court's jurisdiction, based on whether Plaintiffs have

Article III standing, must be addressed at this time.  A class representative must have

standing to assert claims on his or her own behalf in order to have standing to assert

claims as a class representative.  See, e.g., In re Milk Products Antitrust Litigation, 195

F.3d 430, 436 (8th Cir. 1999) (because the plaintiff's individual claim was properly

dismissed for lack of standing, it was not a member of the class and could not represent

the class); Sabers v. Delano, 100 F.3d 82, 84 (8th Cir.1996) (absent standing to bring a §

1983 claim in her own right, federal prisoner was not eligible to represent a class of

persons raising the same claim.)

 In order to determine whether the elements of standing are met, the Court must

first address whether Plaintiffs have alleged an injury in fact.  "An 'injury in fact' is an

invasion of a legally cognizable right."  Braden v. Walmart Stores, Inc., 588 F.3d 585,

591 (8th Cir. 2009).  Whether the requisite injury is established "often turns on the nature

and source of the claim asserted," such that a plaintiff's standing frequently tracks his or

her cause of action.  Id.  In other words,  ". . . the question whether he has a cognizable

injury sufficient to confer standing is closely bound up with the question of whether and

how the law will grant him relief."  Id. (citations omitted).   However, the Eighth Circuit

has cautioned against conflating Article III's requirement of an injury in fact with a

plaintiff's potential causes of action, as they are not coextensive.  Id.   For purposes of

Article III standing, a plaintiff must demonstrate an injury to his or her legal interests.  Id.

 at 591-92 (citing Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529

U.S. 765, 771-72 (2000)).   A district court may not certify a class "if it contains members

who lack standing." Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1034 (8th Cir.

2010).

The Eighth Circuit has addressed the important distinction between the

manifestation of a defect sufficient to confer standing and an allegation that a product was

merely at risk for manifesting a defect – insufficient to confer standing. In re Zurn, 644

F. 3d at 604.  The plaintiffs in Zurn were a putative class of homeowners who alleged that

brass fittings used in the defendant's plumbing systems were inherently defective and

"doomed to leak" due to their susceptibility to stress corrosion cracking. Id. at 609.  The

defendant argued against including in the certified class certain "dry plaintiffs," i.e.,

persons owning a structure containing Zurn fittings that had not yet leaked.  The

defendant argued that these dry plaintiffs were similar to the crib owners in O'Neil, who

had not suffered a cognizable injury. Id. at 616.  The Eighth Circuit, affirming the district

court, held that the dry plaintiffs' claims were distinct from "no-injury plaintiffs'" claims

because the dry plaintiffs had alleged that their brass fittings exhibited a defect. Id. at

617.  Plaintiffs' expert examined and tested Zurn brass fittings –  both new fittings that

had not leaked and used fittings that had leaked – and found that rapid stress corrosion

cracking would occur in all of the fittings. Id. at 609.  Rather than merely being "at risk,"

of future damage, the dry plaintiffs alleged that expert testing demonstrated that the defect

affected all of the fittings upon use. Id.   Accordingly, the court concluded that the dry

plaintiffs had demonstrated the existence of an injury in fact sufficient to confer standing.

17

The United States District Court for the Southern District of Indiana has noted that "[p]roof of injury is arguably the critical element of constitutional standing to sue. The test for injury-in-fact 'requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.'" Hughes v. Chattem, Inc., 818 F. Supp.2d 1112, 1116 -1117 (S.D. Ind. 2011) (citing Sierra Club v. Morton, 405 U.S. 727, 734–35 (1972)).   In reaching its conclusion that the plaintiffs in a diet drug class action lacked standing, the court found that they failed to satisfy Lujan's requirement of an injury-in-fact. Id. at 1119.  The court acknowledged that, while a report published by a consumer group may have alarmed the plaintiffs about the effects of the diet drug Dexatrim, "'[f]ear and apprehension about a possible future physical medical consequence of exposure . . . is not enough to establish an injury in fact.'" Id. (citing Georgine v. Amchem Prods., Inc., 83 F.3d 610, 636 (3d Cir. 1996) (Wellford, J., concurring). The court further noted that past exposure to wrongful conduct does not establish standing absent a showing of continuing adverse effects.  Id. (citing Lujan, 504 U.S. at 563.)   At best, the court found that the plaintiffs suggested that they might experience future harm from their limited exposure to the drug, and, having viewed the report in question, wished that they had not purchased Dexatrim.  Id. at 1120.  In the court's view, "neither suggestion comes close to establishing the injury-in-fact."  Id.

Applying this precedent to the facts of this case, the Court finds that Plaintiffs have failed to adequately plead an injury in fact sufficient to confer standing as to their product liability claims.   Unlike Zurn, in which the dry plaintiffs alleged a defect that was

present upon installation – a claim supported by expert testing of both new and used pipes – Plaintiffs here offer no such factual support for their claims.  Instead, Plaintiffs broadly argue that, based on the Schuell Memo alone, none of the AlumiPex piping ever sold by Defendants complies with NSF 61.  (Pls' Uponor Opp'n Mem. at 9 [Doc. No. 25]) (emphasis in original).  Moreover, unlike the plaintiffs in the Dexatrim class action, Hughes, who at least purchased the diet drug, and still lacked standing, there is not a sufficient showing here that the Plaintiffs actually have  pipes that contain a toxin. Sweeping allegations of harm must be supported by enough facts to render them plausible and this Complaint fails to include such facts.

Again, Plaintiffs' counsel conceded that Plaintiffs have not conducted any testing on their pipes to determine whether they exhibit the alleged defect found in the non-NSF conforming Uponor pipes.   This distinguishes this case from Zurn, where the plaintiffs' expert opined that his testing revealed the defect in both the new and used pipe in question.  644 F.3d at 609.  Having failed to allege enough facts to sustain a plausible allegation of injury, Plaintiffs lack the standing necessary to confer Article III jurisdiction over their claims.

### 3.    Privity for Breach of Express Warranty Claim

Defendants alternatively argue that Plaintiffs' express warranty claims fail for lack of privity under Indiana law.  Because Plaintiffs are not the original owners of their residence (see Building Permit, Uponor's Ex. B [Doc. No. 21-1]; Warranty Deed, Ex. A to Aff. of Heidi A.O. Fisher [Doc. No. 27]; Compl. ¶ 83), Defendants argue that the

respective express limited warranties extend only to the original owners of the home, and that Plaintiffs lack privity under Indiana law.[3]

In Indiana, vertical privity must be shown in order to sue for breach of an express warranty.  Atkinson v. P & G Clairol, Inc., 813 F. Supp.2d 1021, 1026 (N. D. Ind. Apr. 25, 2011); Ind. Code Ann. § 26-1-2-318.   Vertical privity exists only between immediate links in a chain of distribution.  Atkinson, 813 F. Supp.2d at 1026, n.3.  "A buyer in the same chain who did not purchase directly from a seller is 'remote' as to that seller."  Id.

Vertical privity is not required for a claim for the breach of the implied warranty of merchantability under Indiana law.  Id.   However, parties to a contract for the sale of goods may exclude or modify the implied warranty of merchantability.  Perry v. Gulf Stream Coach, Inc., 814 N.E.2d 634, 645-46 (Ind. Ct. App. 2004).  In order to make such a change, however, the language must use the word "merchantability," and the writing must be conspicuous.  Ind. Code. § 26-1-2-316, subdiv. 2.  A printed heading in capital letters is deemed conspicuous and language in the body of a form is conspicuous if it is in larger or other contrasting type or color.  Ind. Code § 26-1-1-201(10).  Whether a term or clause is conspicuous or not is a decision for the court.   Id.

To the extent that Indiana law applies, Plaintiffs are not in privity with Defendants

---

[3]  This argument applies only to the extent that Indiana law applies to Plaintiffs' warranty claims.  Under Minnesota law, privity is not required in actions for breach of warranty, either express or implied.  Church of the Nativity of Our Lord v. WatPro, Inc., 474 N.W.2d 605, 609 (Minn. Ct.  App. 1991).  In addition, a seller's warranty extends to any person who can reasonably be expected to use or to be affected by the goods and who was injured by the breach, irrespective of privity of contract.  Minn. Stat. § 336.2-318.  A seller may not exclude or limit the operation of this statute.  Id.

and their express warranty claim therefore fails for this additional reason.  As to their

implied warranty of merchantability claim, the respective limited warranties specifically

and conspicuously mention merchantability.  Uponor's disclaimer language is in all

capital letters (Uponor Limited Warranty, Ex. F to Raiter Uponor Aff. [Doc. No. 26-1]),

and Weil-McLain's disclaimer language is both in bold-face type and all-capital letters.

(Weil-McLain's Limited Warranties, Exs. C & D to Fisher Aff. [Doc. Nos. 24-3 & 24-4].)

Moreover, claims such as this for the implied warranty of merchantability under Indiana

law require pre-suit notice.  Collins v. Pfizer, Inc., No. 08-0888, 2009 WL 126913, *2-4

(S.D. Ind. Jan. 20, 2009); Lemon v. Anonymous Physician, No. 04-2083, 2005 WL

2218359, *2 (S.D. Ind. Sept. 12, 2005).  Plaintiffs fail to allege that any such notice was

given.  While Plaintiffs cite Bridgestone/Firestone, 155 F. Supp. 2d at 1110, for the

proposition that the filing of a lawsuit constitutes the requisite notice, the court in that

case applied Michigan and Tennessee law, and other Indiana decisions, as noted, require

pre-filing notice.   Therefore, to the extent that Indiana law applies, Plaintiffs' warranty

claims fail as matter of law for these additional reasons.

### 4.      Statutes of Limitation

A four-year statute of limitations applies to Plaintiffs' warranty actions under both

Indiana and Minnesota law.  Ind. Code Ann. § 26-1-2-725(2); Minn. Stat. § 336.2-725.

Under both states' statutes, such claims accrue when tender of delivery is made.  Id.

Although the Complaint does not indicate the date on which Plaintiffs' home was

built or purchased by Plaintiffs, public records provided by Defendants, which this Court

considers, indicate that building permits for Plaintiffs' residence were issued by

September 26, 2002 and the home was approved for occupancy by a Michigan City

Electrical Inspector on September 26, 2003.  (Building Permit of 7/11/02, Uponor Ex. B

[Doc. No. 21-1]; Plumbing Permit of 8/20/02, Uponor Ex. C [Doc. No. 21-2]; Electrical

Permit of 9/26/02, Uponor Ex. D [Doc. No. 21-3]; Final Inspection Report of 9/23/03,

Uponor Ex. E [Doc. No. 21-4].)  Also, property tax records from the LaPorte County

Assessor identify 2002 as the year of construction of the Thunanders' home.  (County

Assessor Card, Uponor Ex. G [Doc. No. 21-6].)  Plaintiffs purchased their home on or

about December 4, 2007.  (Warranty Deed, Ex. A to Aff. of Heidi A.O. Fisher [Doc. No.

27].)  This action was filed on August 12,  2011.  More than four years passed since the

tender of delivery of goods to the original homeowners – in fact, eight years passed from

2002 to the time of the filing of this suit in 2011.

Both Minnesota's and Indiana's statutes, however, also provide for an alternative

accrual rule, such that if the warranty extends to future performance of the product and

discovery of the breach must await the time of such performance, the cause of action

accrues when the breach is or should have been discovered.  Minn. Stat. § 336.2-725; Ind.

Code Ann. § 26-1-2-725(2).   As noted, Indiana law requires privity for express warranty

claims, which Plaintiffs lack.  Moreover, the Weil-McLain warranty itself is limited to

original purchasers.[4]  (Weil McLain Limited Warranties, Exs. C & D to Fisher Aff. [Doc.

---

[4] While Weil-McLain's warranties refer to radiant heating products, as opposed to
potable water products, Weil-McLain avers that its warranty applied to AlumiPex

(continued...)

Nos. 24-3 & 24-4] (stating that the warranty extends "to the first retail purchaser").

Uponor's Limited Warranty warrants against defects in materials and workmanship for a 25-year period, commencing upon installation.  (Uponor Limited Warranty, Ex. F to Raiter Uponor Aff. [Doc. No. 26-1].)   While Weil-McLain's limited warranty extends for a 30-year period against defects in material and workmanship, again, it extends only to the first retail purchaser of the product. (Exs. C & D to Fisher Aff. [Doc. Nos. 24-3 & 24-4].)  Therefore, it does not appear that the express terms of the Weil-McLain warranty apply to the Thunanders, who were not the first retail purchasers of the AlumiPex pipe in their residence.  In any event, any such warranties provided by both Defendants against "defects" are unavailing, as Plaintiffs have failed to allege a plausible defect.   The Court therefore finds that the four-year statutes of limitations under both Minnesota and Indiana law bar Plaintiffs' claims, absent tolling of the statutes.

### 5.      Fraudulent Concealment/Equitable Tolling

Plaintiffs contend that the statutes of limitations applicable to their warranty claims, and the limitations statutes applicable to their other claims, are tolled by virtue of the doctrine of fraudulent concealment.  Plaintiffs plead the doctrine as an independent claim in the Complaint.  (Compl., Count XII [Doc. No. 1].)  However, the Court

---

[4](...continued)
products, regardless of whether they were used for radiant heat or potable water.  (Aff. of Scott Berg ¶ 6 [Doc. No. 30].)
     The Uponor limited warranty extends to subsequent owners of real property during the ten-year period following the applicable installation date.  (Ex. F to Raiter Uponor Aff. [Doc. No. 26-1].)

addresses it here, in the context of the first of Plaintiffs' claims to which the doctrine

might apply.

The doctrine of fraudulent concealment of a cause of action has long been used in

Minnesota to toll the applicable statute of limitations, as the Minnesota Supreme Court

held in 1931:

> [W]hen a party against whom a cause of action exists in favor of another, by
> fraudulent concealment prevents such other from obtaining knowledge
> thereof, the statute of limitations will commence to run only from the time
> the cause of action is discovered or might have been discovered by the
> exercise of diligence.

Schmucking v. Mayo, 235 N.W. 633 (Minn. 1931).  Although there is no categorical

definition of what constitutes fraudulent concealment, Minnesota courts have stated that

(1) "[t]he party claiming fraudulent concealment has the burden of showing that the

concealment could not have been discovered sooner by reasonable diligence [,]" and (2)

"the concealment must be fraudulent or intentional." Collins v. Johnson, 374 N.W.2d 536,

541 (Minn. Ct. App. 1985), review denied (Minn. Nov. 26, 1985).   The standard is

essentially the same under Indiana law, which requires a party invoking the doctrine to

allege that the defendant has, "either by deception or by violating a duty, concealed from

the plaintiff material facts, preventing the plaintiff from discovering a potential cause of

action." Logan v. Wilkins, 644 F.3d 577, 582 (7th Cir. 2011).

There must be an affirmative concealment of a cause of action, and absent a

fiduciary relationship, mere silence is not sufficient.  Appletree Square 1 Ltd. Partnership

v. W.R. Grace & Co.,  815 F. Supp. 1266, 1275 (D. Minn. 1993); Tolen v. A.H. Robins

Co., Inc., 570 F. Supp. 1146, 1151-52 (D. Ind. 1983).  "[T]he essence of fraudulent

concealment, then, is that the defendant has engaged in some behavior that has had the

purpose and effect of concealing the presence of a cause of action from the plaintiff."

Appletree Square , 815 F. Supp. at 1275 (citing Henry v. Raynor Mfg. Co., 753 F. Supp.

278, 282–83 (D. Minn.1990)).  "Even in an arm's length transaction, however, misleading

partial disclosures may constitute affirmative fraud and fraudulent concealment."

Drobnak v. Andersen Corp., 561 F.3d 778, 786 (8th Cir. 2009) (citing Marvin Lumber

and Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 877 (8th Cir. 2000)).

      Plaintiffs allege that Defendants knowingly sold pipe that they knew did not

comply with NSF 61, affirmatively concealing Plaintiffs' causes of action.  (Compl. ¶

196.)  They contend that Defendants' mislabeling of the pipe was intended to prevent

Plaintiffs and members of the putative class from discovering their potential claims.  (Id.

¶ 197.)  Further, Plaintiffs allege that even when NSF learned that the pipe had failed

toxicity testing, Defendants did not notify the members of the putative class of its bait and

switch scheme "and that, as the Schuell memorandum concedes, Uponor could not have

manufactured pipe that would have complied with NSF 61."  (Id. ¶ 198.)  In support of

their contention that Defendants' fraudulent concealment is ongoing, Plaintiffs allege that

"[t]o this day," Defendants have continued "this concealment and suppression by failing

to inform the public about the unsuitability of the systems for potable water delivery and

that the systems emitted unacceptable levels of toxic chemicals."  (Id. ¶ 199.)

      While Plaintiffs make such allegations, Iqbal and Twombly require Plaintiffs to

provide factual support for their allegations of fraudulent concealment.  Instead, Plaintiffs

rely on the generalized allegations that underlie their substantive claims.

Plaintiffs fail to adequately plead the element of concealment.  They appear to rely

on the same allegations in their claims alleging fraud as in their fraudulent concealment

claim, which is essentially a defense to the untimeliness of their claims under relevant

statutes of limitations.  However, the law requires a party asserting fraudulent

concealment to plead an affirmative act or statement in furtherance of the fraud.

Drobnak, 561 F.3d at 783.  To the extent that Plaintiffs argue that Defendants' advertising

or promotional literature is part of the fraudulent concealment, Plaintiffs still fail to allege

the necessary predicates to such allegations, i.e., facts showing that Defendants' pipe has

been tested, fails to comply with NSF 61 and that Defendants used the advertising as a

means of furthering the concealment.   In response to the instant motions, Plaintiffs

identify the following paragraphs of the Complaint as supporting their claim of fraudulent

concealment: 15, 16, 18, 43-44, 47-57, 74, 187, 195-201.  (Pl's Uponor Opp'n Mem. at

16 [Doc. No. 25].)  However, these allegations essentially allege inaction, or silence.

They do not demonstrate affirmative acts of concealment.  Plaintiffs cite Richfield Bank

& Trust Co. v. Sjorgen, 244 N.W.2d 648 (1976) and Cohen v. Appert, 463 N.W.2d 787,

790 (Minn. Ct. App. 1990), for the proposition that silence may be sufficient to

demonstrate fraudulent concealment.  Richfield Bank and Cohen, however, simply apply

the general rule that, in the case of a fiduciary or confidential relationship, silence may be

sufficient to show fraudulent concealment.  Richfield Bank, 244 N.W.2d at 651; Cohen,

463 N.W.2d at 790.

While the Thunanders allege that Defendants' concealment of information is ongoing, they point to no facts in support of their contention. There are no facts demonstrating that current pipe fails to meet toxicity standards or that their pipe fails to meet NSF 61. For the reasons set forth above, the Schuell Memo, written in 2003, does not supply the necessary support for claims of fraudulent concealment in the past, or for fraudulent concealment that is ongoing. The brochures and advertisements claiming that AlumiPex piping is compliant with NSF 61 are not evidence of fraudulent concealment, absent some other facts showing that at the time the representations in these documents were made, the Defendants knew them to be untrue and actively concealed such information. In Marvin Lumber, 223 F.3d at 877, the Eighth Circuit held that for fraudulent concealment to toll the applicable statute of limitations, the plaintiff must show that the defendant fraudulently concealed "the very existence of the facts which establish the cause of action" and that the plaintiff was "actually unaware" of these facts.   The Schuell Memo simply does not provide sufficient support for allegations of intent and knowledge or for Plaintiffs' temporal assertions. In short, there is no basis here on which fraudulent concealment applies to toll the statute of limitations for Plaintiffs' warranty claim, or for any claim to which a statute of limitations applies in this case.

### C.      Tort-Based Claims

Plaintiffs allege claims for negligence and negligent failure to warn (Counts IX and X) against both Defendants, as well as a product liability claim under the ILPA

27

(Count I) against Uponor.  As with Plaintiffs' warranty claims, Defendants contend that
Plaintiffs have not plausibly alleged damages, which is an essential element of tort-based
claims.  Defendants further argue that Plaintiffs' tort-based claims fail as a matter of law
pursuant to the economic loss doctrine.  Lastly, Defendants contend that Plaintiffs lack an
injury in fact sufficient to confer standing.  All of these arguments require the Court to
examine Plaintiffs' allegations of harm.

The essential elements of a negligence claim are: (1) the existence of a duty of care
owed to the plaintiff by the defendant; (2) a breach of that duty; and (3) an injury
proximately caused by the breach.  Foddrill v. Crane, 894 N.E.2d 1070, 1075 (Ind. Ct.
App. 2008); Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn.1995).  To establish a
negligent failure to warn claim under Minnesota law, a plaintiff must show that: (1) the
defendant had reason to know of the dangers of using the product; (2) "the warnings fell
short of those reasonably required," breaching the duty of care; and (3) the lack of an
adequate warning caused the plaintiff's injuries.  Tuttle v. Lorillard Tobacco Co., 377
F.3d 917, 924 (8th Cir. 2004) (citing Erickson v. Am. Honda Motor Co., 455 N.W.2d 74,
77–78 (Minn. Ct. App. 1990)).

The ILPA applies to actions brought by consumers against manufacturers or
sellers "for physical harm caused by a product."  Ind. Code. 34-20-1-1.  Under Indiana
law, the ILPA governs product liability claims in which the theory of liability is
negligence, Hitachi Const. Machinery Co., Ltd. v. AMAX Coal Co., 737 N.E.2d 460, 465
(Ind. Ct. App. 2000), and in which the theory of recovery is strict liability against

manufacturers and sellers of allegedly defective products.  Interstate Cold Storage, Inc. v.

General Motors Corp., 720 N.E.2d 727 (Ind. Ct. App. 1999).  Similarly, in a failure to

warn case, determining whether a warning is adequate under the ILPA is governed by the

same inquiry as in a negligent failure to warn claim, including the element of proximate

cause.  Moss v. Crosman Corp., 945 F. Supp. 1167, 1180 (N.D. Ind.1996) (citations

omitted); see Ind. Code § 34-20-2-2 ("[I]n an action based on an alleged design defect in

the product or based on an alleged failure to provide adequate warnings or instructions

regarding the use of the product, the party making the claim must establish that the

manufacturer or seller failed to exercise reasonable care under the circumstances in

designing the product or in providing warnings or instructions.").

## 1.    The Element of Injury, Harm or Damage in Tort

As to the element of injury or harm, Plaintiffs claim that "their damage includes

the cost to replace the [plumbing] system to avoid being further exposed to toxic

substances and to make the property saleable, and damage to other parts of the structure

caused by the defective plumbing system."  (Compl. ¶ 86.)  Plaintiffs identify two types

of  damage:  (1) plumbing replacement costs; and (2) damage to other parts of the home.

(Id.)  Plaintiffs further allege that they "and the putative class have suffered actual

damages in that they have purchased and installed in their homes and structures, a

plumbing system that is defective, unreasonably dangerous and unsuitable in a potable

water system."  (Id. ¶ 177.)  As a result, the Thunanders allege that they and the putative

class will suffer damages including not only the full cost to replace their plumbing

systems, but also property damage, personal injury and consequential and incidental

damages.  (Id. ¶¶ 178; 191.)

Even construing all reasonable inferences in Plaintiffs' favor, the Court finds that

the Thunanders fail to support their tort allegations with sufficient facts to state plausible

tort-based claims for relief.  Notably, the Complaint fails to specify the type of personal

injury in question.  At the hearing on the instant motions, Plaintiffs' counsel identified

exposure to toxicity as Plaintiffs' personal injury.   However, "'[t]o prove causation in a

toxic tort case, a plaintiff must show both that the alleged toxin is capable of causing

injuries like that suffered by the plaintiff in human beings subjected to the same level of

exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury.'"

Medalon v. Tiger Drylac U.S.A., Inc., 269 F. Supp.2d 1118, 1126 (D. Minn. 2003)

(quoting Bonner v. ISP Technologies, Inc., 259 F.3d 924, 928 (8th Cir.2001)).

As discussed in connection with Plaintiffs' warranty claims, Plaintiffs have not

tested their pipes.   Plaintiffs' tort-based allegations do not contain sufficient facts

supporting their claim that the pipes contain a toxin capable of causing injury to humans,

let alone that Plaintiffs themselves have experienced any symptoms attributable to the

alleged toxin.   Rather, Plaintiffs allege future harm – that they "will suffer" damages at

some point in time.  (Compl. ¶¶ 178-191.)   A tort requires the existence of an injury –

"[t]he threat of future harm, not yet realized, is not enough. Negligent conduct is itself not

such an interference with the interests of the world at large that there is any right to

complain of it, or to be free from it, except in the case of some individual whose interests

30

have suffered." W. Page Keeton et al., <u>Prosser and Keeton on Torts</u> 165 (5th ed.1984).

As the court observed in <u>Bridgestone/Firestone</u>:

> . . . simply owning tires or a vehicle with a defect is much like owning a
> building with asbestos in it. Plaintiffs are faced with the threat that the tires
> may suffer from a tread separation incident at any given moment, or that
> their vehicle will roll over in the event of an accident, in the same way the
> building owner is faced with the threat that the asbestos may escape into the
> air at any given moment. But until that occurs, no legally cognizable tort
> has been committed.

155 F. Supp.2d at 1088 (applying Michigan and Tennessee law).  Here, Plaintiffs have

not established the foundation on which their tort claims are based – namely, that their

pipes suffer from a defect resulting in the type of harm recognized and compensated in

tort law. Their allegations of personal injury require a level of boot-strapping that is not

supported by the facts, nor countenanced by the law.  They have not adequately pled

personal injury and any such claim fails as a matter of law.

Plaintiffs' other alleged tort-based injuries consist of plumbing replacement costs

and "damage to other parts of the structure " caused by the plumbing system.  (Compl. ¶

86.)  For the reasons set forth above, Plaintiffs have failed to sufficiently plead the

existence of a cognizable injury that was proximately caused by Defendants' pipes.  They

have not tested the pipes.  Plaintiffs explain in their opposition memorandum to Weil-

McLain's motion that their allegations regarding damage to "other parts of the structure"

refer to "contamination of Plaintiffs' water caused by the non-compliant pipe."  (Pl.'s

Weil-McLain Opp'n Mem. at 38 [Doc. No. 25].)   Even assuming that Plaintiffs' water

constitutes "other parts of the structure," the Complaint is devoid of any allegations

demonstrating that Plaintiffs have tested their water to support their assertion of

contamination.  Plaintiffs therefore fail to state a claim for relief as to damage to "other

parts of the structure."

>        2.        **Economic Loss Doctrine**

Even if Plaintiffs had adequately pled the elements of a tort-based claim, whether

under common law, or the ILPA, Plaintiffs' alleged "injury" of incurring plumbing

replacement costs is not permitted under the economic loss doctrine.   Under the

economic loss doctrine, a plaintiff is prohibited from recovering purely economic losses

in tort.  <u>See</u> <u>Daigle</u>, 713 F. Supp.2d at 829-30; <u>Gunkel v. Renovations, Inc.</u>, 822 N.E.2d

150, 151 (Ind. 2005).   "'Economic losses' occur when there is no personal injury and no

physical harm to other property." <u>Gunkel</u>, 822 N.E.2d at 153 (citing W. Prosser,

<u>Handbook on the Law of Torts</u> § 101, at 665 (4th ed.1971)).  "[T]he economic loss rule

reflects that the resolution of liability for purely economic loss caused by negligence is

more appropriately determined by commercial rather than tort law." <u>Indianapolis-Marion</u>

<u>Cty. Pub. Library v. Charlier Clark & Linard, P.C.</u>, 929 N.E.2d 722, 729 (Ind. 2010).

Contract law applies to damage to the product or service itself and purely economic loss

arising from the failure of the product or service to perform as expected. <u>Gunkel</u>, 822

N.E.3d at 153.  The economic loss doctrine, as codified under Minnesota law, provides

that a buyer may not bring a product defect tort claim for compensatory damages unless

the defect "caused harm to the buyer's tangible personal property other than the goods or

the buyer's real property."  Minn. Stat. § 604.101, subd. 3.  A buyer is limited to contract

and warranty remedies if the damages sought consist of damages to the product itself.  Id.

Where, however, the defect causes personal injury or damage to other property, the

economic loss rule will not apply and a plaintiff may seek recovery in tort.  Id.; Gunkel,

822 N.E.2d at 153.

In Daigle, 713 F. Supp.2d at 829-30, this Court applied the economic loss doctrine,

finding that the plaintiffs' tort claims for negligence and strict liability were barred by

Minn. Stat. § 604.101.  The plaintiffs were minivan owners who brought a putative class

action, alleging that a design defect in their vehicles' torque converter caused

transmission failure.  Id. at 824-25.  However, while the plaintiffs alleged that several of

their transmission failures had occurred in risky situations, none of them suffered any

personal injury or damage to real property as a result of a vehicle breakdown.  Id. at 830.

The Indiana Supreme Court applied the economic loss doctrine in Indianapolis-

Marion Cty. Pub. Library, 929 N.E.2d at 732.  In that case, the city library filed an action

against its engineering subcontractors, alleging that the defendants provided defective

design and inspection services in connection with the renovation and expansion of the

city's library.  Id. at 725.  The court held that the damage in question was not to "other

property," and the economic loss rule applied, precluding the library's recovery under a

tort theory:

> Here the Library purchased a complete refurbishing of its library facility
> from multiple parties. The Library did not purchase a blueprint from the
> Defendants, concrete from the materials supplier, and inspection services to
> ensure the safety of the construction project in isolation; it purchased a
> complete renovation and expansion of all the components of its facility as
> part of a single, highly-integrated transaction. Thus, irrespective of whether

33

> Defendants' negligence was the proximate cause of defects in the design of
> the library facility, for purposes of the other property rule, the product or
> service that the Library purchased was the renovated and expanded library
> facility itself.

Id. at 731.  In reaching its conclusion, the court distinguished the facts before it from those in Gunkel.  In Gunkel, the plaintiff contracted with a corporation other than the defendant to build an entirely new home, then contracted separately with the defendant to attach a stone facade.  822 N.E.2d at 156.   The Indiana Supreme Court held that while the economic loss doctrine precluded tort recovery for damage to the facade itself, recovery for damage to other parts of the home caused by the allegedly negligent installation of the facade was permissible under the "other property" rule.  Id.

The economic loss rule precludes Plaintiffs' claims here.  To the extent that Plaintiffs allege personal injury, the allegations are vague and insufficiently supported.  The Complaint does not specify the "other property" for which it alleges an injury.  While Plaintiffs argue that the damage is to the Plaintiffs' water, the Complaint fails not only to identify this damage, but also fails to indicate whether the water contains toxins.  Moreover, the Complaint refers to Plaintiffs' potable water system and/or plumbing system.  Like the Indiana library case, the alleged defect is in the pipes themselves, which are highly integrated with the plumbing system.   Because the economic loss doctrine precludes recovery in tort for such claims under both Minnesota and Indiana law,

Plaintiffs' tort claims (Counts I, IX and X) are dismissed.

### 3.    Agency

In response to Weil-McLain's argument that certain claims cannot be asserted against it, Plaintiffs argue that Weil McLain is liable under various claims pursuant to an agency theory of liability.   (Pls' Weil-McLain Opp'n Mem. at 8-10 [Doc. No. 27].) Specifically, Plaintiffs refer to their negligence claims in Counts XI and XII, their IDCSA claim in Count IV, and their claim for fraudulent concealment/equitable tolling in Count XII. (Id. at 5, n.2.)  In support of their agency argument, Plaintiffs contend that (1) Weil-McLain manifested consent for Uponor to manufacture the pipe and to obtain NSF approval on its behalf; (2) Uponor accepted Weil-McLain's authority to manufacture the pipe; and (3) Weil-McLain exerted control over Uponor's actions in the manufacture and listing process of this pipe.  (Id. at 8.)

To establish an agency theory, a plaintiff must plead facts demonstrating the three requisite elements of an agency relationship: (1) manifestation of consent by the principal; (2) acquiescence by the agent; and (3) control exerted by the principal over the agent.  Leon v. Caterpillar Indus., Inc., 69 F.3d 1326, 1333 (7th Cir. 1995); McNeely v. Clayton & Lambert Mfg. Co.,  292 F. Supp. 232, 240 (D. Minn. 1968).  In order to rely upon an agency theory, a plaintiff must plead facts demonstrating the elements of an agency relationship.  United States v. Rathbone Ret. Cmty., Inc., No. 08-174, 2009 WL 2147878, at *2 (S.D. Ind. July 15, 2009) (holding that a plaintiff must allege facts demonstrating a principal/agent relationship and granting judgment on the pleadings

where the complaint failed to contain factual allegations beyond a speculative level of an agency relationship); Erickson v. Horing, 99-CV-1468 (JRT/FLN), 2001 WL 1640142, *12 (D. Minn. 2001) (finding that the plaintiffs' "bare legal conclusion of agency" were insufficient and dismissing claim as to defendants against whom agency liability was asserted).

Even if the Court found that Plaintiffs established a sufficiently-pled negligence claim, the Complaint here fails to contain even a bare legal conclusion of agency, let alone specific facts supporting a theory of agency liability, in order to plead liability as to Weil-McLain.   Plaintiffs point to paragraphs 9, 14, 19 and 39 of the Complaint in support of their argument that they have adequately alleged agency.  Those paragraphs, however, simply allege that Uponor manufactured pipe and that Weil-McLain sold it.  They do not establish an agency relationship for this claim, or any other claim alleged in the Complaint.  Therefore, the Court finds that to the extent that Weil-McLain's liability is predicated on an agency theory, Plaintiffs' claims against Weil-McLain fail as a matter of law.

### 4.    Standing

As noted, pursuant to Lujan, 504 U.S. at 560-61, Plaintiffs must demonstrate the existence of an injury in fact in order to confer Article III jurisdiction.  Similar to Plaintiffs' warranty claims, in which Plaintiffs failed to allege a defect and an injury in fact, Plaintiffs have likewise failed to allege the harm or injury necessary to sustain a cause of action sounding in tort.    The Court concludes that Plaintiffs lack standing as to

their tort-based claims and the claims must be dismissed for lack of subject matter jurisdiction.

**D.     Consumer Protection Fraud-Based Claims**

As noted, Plaintiffs assert fraud-based claims against both Defendants under the the Indiana Deceptive Consumer Sales Act ("IDSCA"), Ind. Code Ann. § 24-5-0.5-3 (Count IV), and against Uponor alone under the following Minnesota consumer protection statutes:  the Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. § 325F.69 (Count V); the Minnesota Unlawful Trade Practices Act ("MUTPA"), Minn. Stat. § 325D.13 (Count VI); the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. 325D.44 (Count VII); and the Minnesota False Statement in Advertisement Act ("MFSAA"), Minn. Stat. § 325F.67 (Count VIII).

**1.     IDCSA Claim**

In Count IV of the Complaint, Plaintiffs assert a statutory claim for deceptive consumer sales under the IDCSA against Defendants.  Pursuant to the IDSCA, a supplier of goods may not represent, among other things, that its goods have certain characteristics, sponsorship or approval that the goods do not have, and which the supplier knows or should reasonably know that the goods do not possess.  Ind. Code. § 24-5-0.5-3.  Similarly, a supplier may not represent that its goods are of a particular standard or quality when the supplier knows, or should reasonably know otherwise.  Id. A claim under the IDSCA must allege that a defendant engaged in one or more defined deceptive acts.  Ind. Code. § 24-5-0.5-4(a).   These acts may be "uncured" deceptive acts,

or "incurable" deceptive acts. McKinney v. State, 639 N.E.2d 65, 68 (Ind. 1998).

An "uncured" deceptive act is a

"deceptive act ... with respect to which a consumer who has been damaged by such act has given notice to the supplier," but the supplier either fails to offer to cure within thirty days or does offer to cure but fails to cure within a reasonable time after the consumer accepts the offer.

Id. (quoting Ind. Code. § 24-5-0.5-2(a)(7)). An incurable deceptive act is "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead."  Ind. Code § 24-5-0.5-2(a)(8).

 Here, Plaintiffs contend that Defendants are "suppliers" of consumer goods as defined in Ind. Code § 24-5-0.5-2(a)(3).   (Compl. ¶ 118.)  They allege that Defendants falsely and deceptively labeled and advertised the AlumiPex and Multicor systems as being safe and approved for use, in compliance with NSF 61 and ASTM 1281.  (Id. ¶ 120.)  By making such misrepresentations, Plaintiffs allege that Defendants committed an incurable deceptive act as defined by Ind. Code § 24-5-0.5-2. (Id. ¶ 121.)

### a.    Statute of Limitations

A claim under the IDCSA must be brought within the applicable two-year statute of limitations, commencing on the date of the "deceptive act."  Ind. Code § 24-5-0.5-5.  Again, Plaintiffs' allegations in Count IV are short on detail and provide no specific dates.   It appears that one of the latest dates in the Complaint corresponds to the distribution of Weil-McLain brochures until at least 2009 describing AlumiPex piping as NSF 61-approved.  (Compl. ¶ 69.)  To the extent that Plaintiffs allege that Defendants made misrepresentations about the approval of the pipes, and to the extent that Plaintiffs

rely on these allegations in support of their consumer claims, such as their claims under the IDCSA, the Court finds no factual support plead that such statements were deceptive or fraudulent.

The Schuell Memo does not establish an intentional, deceptive practice that provides a solid foundation on which to base the broad allegations of fraud found in the Complaint. At most, the Schuell Memo describes Uponor's conduct for a particular period of time in 2003. Because they have not tested their pipes, Plaintiffs are unable to tie that 2003 conduct to their property. Plaintiffs fail to allege, with any sufficient facts, that Uponor made any sales of the allegedly defective piping following the purported lapse in NSF 61 approval in 2003. Plaintiffs purchased their home in 2007. To the extent that they relied on any alleged misrepresentations that may have existed in 2007, their claim under the IDSCA's two-year statute of limitations has since expired. Plaintiffs' IDSCA claim is dismissed for this additional reason.

### b.    Rule 9(b) Heightened Pleading Standard

An IDCSA claim alleging an incurable deceptive act must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b). Young v. Harbor Motor Works, Inc., No. 07-31, 2009 WL 187793,*6 (N. D. Ind. Jan. 27, 2009); SMC Corp. v. Peoplesoft Inc., No. 00-01095, 2004 WL 2538641, *4 (S.D. Ind. Oct. 12, 2004). To meet this standard, a plaintiff must allege "the who, what, where, when, and how" of the fraud claim. Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir. 2007).

The facts in the Complaint fail to support a claim under the IDCSA and fail to

meet the heightened pleading requirements of Rule 9(b).  Assuming that Defendants meet

the definition of a "supplier" under the IDSCA, Ind. Code. § 24-5-0.5-2, Plaintiffs fail to

plead facts that sufficiently support the "deceptive acts" element of a claim under the

statute.  See Ind. Code § 24-5-0.5-3.  Plaintiffs fail to sufficiently support the bare

allegation that because, for a certain period in 2003, Uponor's pipes failed to meet the

NSF standards for toxicity, Uponor was involved in an intentional scheme to deceive, and

that the scheme involved the Plaintiffs' specific pipes.  Plaintiffs have not tested their

pipes and they are therefore unable to allege whether the pipes contain the toxin discussed

in the Schuell Memo.

 While the Schuell Memo describes the state of affairs at Uponor as of 2003, it does

not support a claim under the IDSCA.  It refers to the practice of producing a special

sample for NSF inspection "in the past."  (Schuell Memo at ¶ 3 [Doc. No. 26-1].)  In the

September 2003 memo, Mr. Schuell observes that Uponor's "current production

processes" at the German facility only allow for production of NSF-conforming pipe in a

limited way.  These vague temporal references do not establish the requisite "when"

necessary to satisfy Rule (b) and they are insufficient to plead an intentional scheme.  (Id.

¶ 11.)  To the contrary, to the extent that knowledge, or even intent, are addressed in the

memo, Mr. Schuell notes that the employee who assumed the U.S. product approvals after

his predecessor left, "knew nothing about this and only found out about it coincidentally."

(Id.)  Schuell indicates that at the beginning of August 2003, an "Uponor North America"

employee, Rich Houle, was informed by the NSF about the toxic substances in the pipes.

(<u>Id.</u> ¶ 4.)  Further undercutting Plaintiffs' contention that the memo establishes a scheme

of fraud with the requisite intent, Schuell acknowledges that "with today's knowledge," it

was clear that the sample pipes taken directly from the production line by NSF could not

have met the NSF requirements.  (<u>Id.</u> ¶ 4.)   The memo establishes that at a certain point

in time, Uponor provided special pipe samples to NSF, but the terms of the memo do not

support Plaintiffs' contention that all of Uponor's pipes, for all time, were deceptively

offered for sale.

      As discussed in more detail in connection with Plaintiffs' Minnesota statutory

claims, *infra*, the Court finds that Plaintiffs' IDCSA claim also fails to satisfy the

heightened pleading standard of Rule 9(b).  Although Count IV refers to the preceding

factual allegations in the Complaint, nowhere is there a sufficiently-supported allegation

of either defect or fraud.  Count IV is devoid of any specific references to who, what,

when, where and why that is required under Rule 9(b).  For example, Plaintiffs leave it to

the Court to determine to which of the various factual allegations Plaintiffs cross-

reference in support of their IDCSA claim, stating, in Count IV, "[b]y engaging in the

conduct described herein," and "[b]y making the intentional misrepresentations set out in

this Complaint, which are hereby incorporated," Defendants violated the IDCSA.

(Compl. ¶¶ 120-21.)

      While the Court finds this claim lacking as to both Defendants, application of the

IDSCA to Weil-McLain further fails because Plaintiffs do not establish the "who"

necessary for pleading an allegation that involves fraud.  <u>Young</u>, 2009 WL 187793, at *7

(N. D. Ind. Jan. 27, 2009) (because the plaintiff did not identify any deceptive act engaged in specifically by one of the defendants, he failed to meet the factual particularity requirement of Rule 9(b) as to that defendant).   For these reasons, the Court finds that Plaintiffs' claims under the IDSCA fail as a matter of law.

### 2.   Minnesota Consumer Protection Claims

#### a.   Statute of Limitations

Plaintiffs allege several consumer claims against Uponor alone in Counts V-VIII under the MCFA, the MUTPA, the MDTPA, and the MFSAA.  According to Minnesota law, an action based upon a liability created by Minnesota statute is subject to a six year statute of limitation.  Minn. Stat. § 541.05, subd. 1(2).  The six year limitations period begins to run on the date of sale and Minn. Stat. § 541.05 is not delayed based on the discovery of a potential claim.  Klehr v. a.O. Smith Corp., 875 F. Supp. 1342, 1352-53 (D. Minn. 1995), aff'd, 87 F.3d 231 (8th Cir. 1996), aff'd, 521 U.S. 179 (1997).

Plaintiffs contend that they received "the misrepresentations and omissions described herein when deciding to purchase a home with an AlumiPex plumbing system." (Compl. ¶ 133 [Doc. No. 1].)  The date of sale of the product, however, commences the running of the statute of limitations.  In this case, the pipes contained in the Thunander's house were sold to the original owners when the house was built in 2002.  (County Assessor Card, Uponor Ex. G [Doc. No. 21-6].)   The Court finds that Plaintiffs' Minnesota statutory claims are therefore time-barred.  For the reasons set forth herein, the Court finds that the doctrine of fraudulent concealment does not apply and the statute of

42

limitations is not equitably tolled.

### b.   Rule 9(b) Pleading Requirements

Even if the statute of limitations did not apply to Plaintiffs' Minnesota statutory claims against Uponor, the claims fail to meet the heightened pleading requirements under Fed. R. Civ. P. 9(b) for claims alleging fraud.  As noted previously, Rule 9(b) requires that circumstances constituting fraud be pleaded with particularity. Fed.R.Civ.P. 9(b).  In order to satisfy Rule 9(b), the complaint must allege "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby."  Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 746 (8th Cir.2002) (citations omitted).  In other words, the complaint must plead the "who, what, where, when, and how" of the alleged fraud.  United States ex rel. Joshi v. St. Luke's Hospital, Inc., 441 F.3d 552, 556 (8th Cir. 2006) (citations omitted).  "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule."  Schaller Tel. Co., 298 F.3d at 746 (quoting Commercial Prop. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir.1995)).

In Counts V-VIII, Plaintiffs offer conclusory statements referring to Uponor's fraudulent, misleading and deceptive statements and practices.  While the allegations within these Counts purportedly incorporate the prior factual allegations by reference, notably absent from any allegation in the Complaint is the requisite "who, what, when, where and why" necessary to sustain a claim for fraud.  For example, in Paragraph 57 of

  
the Complaint, Plaintiffs allege that certain Uponor employees were "involved in [the]

scheme," but Plaintiffs fail to plead facts establishing how, when, where and in what

capacity these employees were involved.  Other than what is contained in the Schuell

Memo, which fails to establish the facts necessary to support Plaintiffs' claims, there are

no allegations showing who made the purported misrepresentations, when the statements

were made, or any facts supporting the allegation that the statements were known to be

false when made.

### 3.    Standing for Consumer Protection Claims

In addition to the failings of Plaintiffs' statutory consumer claims under Indiana

and Minnesota law, the Court finds that Plaintiffs also lack standing to sue as to these

claims, because they have failed to demonstrate the necessary injury in fact.

Under Minnesota law,"[s]tatutory grants of standing are quite [ ] broad as to

consumer protection."  State by Humphrey v. Philip Morris Inc., 551 N.W.2d 490, 496

(Minn. 1996).  This Court has therefore held that Minnesota Statutes §§ 325D.44,

325F.67, and 325F.69 reflect "clear legislative policy encouraging aggressive prosecution

of statutory violations," and therefore, "are generally very broadly construed to enhance

consumer protection."  Kinetic Co. v. Medtronic, Inc., 672 F. Supp.2d 933, 945 (D. Minn.

009) (quoting State of Minnesota v. Philip Morris Inc., 551 N.W.2d 490, 496 (Minn.

1996)).  The general enabling statute provides that "any person injured" by violation of

the enumerated consumer statutes may bring a civil action.  Minn. Stat. § 8.31, subd. 3a.

A plaintiff "need only plead that the defendant engaged in conduct prohibited by the

statutes and that the plaintiff was damaged thereby."   Kinetic, 672 F. Supp.2d at 945

(citing Group Health Plan, Inc. v. Philip Morris Inc., 621 N.W.2d 2, 8-9 (Minn.2001)).

"Under the enabling statute, it is not necessary to plead individual consumer reliance on

defendant's wrongful conduct; however, plaintiff must prove a "causal nexus" between

defendant's wrongful conduct and plaintiff's injuries." Id.

        In Hughes v. Chattem, Inc., 818 F. Supp.2d at 1117-18, the Indiana federal court

found that the plaintiffs lacked standing sufficient to confer subject matter jurisdiction

over their Dexatrim claims, which included claims under the IDSCA.  As noted in

Hughes, the court observed that proof of injury is the critical element of constitutional

standing to sue, and the plaintiffs had failed to establish an injury in fact.  Id. at 1116.

        Despite the broad construction for standing under Minnesota's and Indiana's

consumer protection laws, the essential element of an injury is required.  As noted herein,

Plaintiffs have failed to establish the necessary element of injury necessary to confer

standing and their statutory consumer protection claims must be dismissed for this

additional reason.

        E.      Declaratory/Injunctive Relief

        Defendant Uponor also argues that Count XI, in which Plaintiffs seek a declaratory

judgment, should be dismissed as duplicative of the causes of action otherwise alleged in

the Complaint.   Count XI seeks a declaratory judgment that (a) to the extent that

Defendants allege that any warranty disclaimers preclude full recovery of damages, such

disclaimers fail because of Defendants' fraudulent concealment; (b) to the extent that

Defendants allege that any warranty disclaimers preclude full recovery of damages, such disclaimers fail because the plumbing system defects are latent and Plaintiffs lack sufficient bargaining power; (c) the AlumiPex and MultiCor systems are unsuitable for use in potable water systems because they do not comply with NSF 61 and ASTM 1281; (d) the AlumiPex and Multicor systems used in potable water applications need to be replaced because of their noncompliance with NSF 61 and ASTM 1281; and (e) to the extent that Defendants receive an adverse adjudication arising from the Complaint, the putative class may use offensive collateral estoppel against Defendants for the rulings and determinations therein.  (Compl. ¶ 194(a)-(e).)

In Daum v. Planit Solutions, Inc., 619 F. Supp.2d 652, 657 (D. Minn. 2009), this Court dismissed the plaintiff's declaratory judgment count as duplicative of the plaintiff's breach of contract count.  Here, in subparagraphs (c) and (d), Plaintiffs seek a declaratory judgment that duplicates the allegations that Plaintiffs allege in essentially all of their claims.  In Daum, this Court also dismissed a second declaratory judgment count as unripe.  Id.  The Court noted that the ripeness doctrine is applicable to declaratory judgment actions, and before a claim is ripe for adjudication, the plaintiff "must face an injury that is 'certainly impending.'" Id. (citations omitted).  The allegations in Daum's second declaratory judgment count did not support the conclusion that he faced "impending injury."  Id.  Rather, the allegations were framed in hypothetical terms — that various provisions of an agreement "could" have a negative result.  As to the relief sought in subparagraphs (a), (b) and (e), Plaintiffs likewise seek recovery for controversies that

have not yet occurred.  Because the relief sought in Plaintiffs' Count XI is either duplicative of their other claims, or unripe, Plaintiffs' declaratory judgment count is dismissed.

The declaratory judgment count also fails as a matter of law because other adequate legal remedies exist.  "Equitable remedies are available when no adequate legal remedy exists."  Drobnak, 561 F.3d at 787 (citing ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 305 (Minn. 1996)); Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992); Zimmerman v. Lasky, 374 N.W.2d 212, 214-15 (Minn. Ct. App. 1985).  Here, Plaintiffs may have had an adequate legal remedy against Defendants if they had tested their pipes to determine whether they contained the alleged toxins and, if so, had they adhered to the Rule 9(b) pleading requirements.  Because an adequate remedy existed, their claims for equitable relief are therefore dismissed.  See Drobnak, 561 F.3d at 787 (barring equitable recovery for failure to adhere to statutory notice and Rule 9(b) pleading requirements); ServiceMaster, 544 N.W.2d at 306 (barring equitable recovery for failure to follow statutory or constitutional requirements to perfect a mechanic's lien).

The Plaintiffs also lack standing to pursue their claim in Count XI seeking injunctive relief.  A plaintiff seeking prospective relief must allege the likelihood of future harm.  Meuir v. Greene Cty. Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007).  As noted, Plaintiffs have failed to establish that the pipe in their residence is the allegedly defective pipe manufactured by Uponor.  Moreover, to the extent that Plaintiffs rely on

admissions in the Schuell Memo, the Supreme Court has held that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." <u>Lujan</u>, 504 U.S. at 564.  It is not enough for Plaintiffs to simply allege that they have been injured or may be injured in the future, when that injury is premised upon the assumption, without supporting facts, that the pipes in their plumbing system are defective.  Plaintiffs' claim for injunctive relief in Count XI fails to demonstrate the threat of prospective injury.

**F.    Plaintiffs' Request to Amend Their Complaint**

In their opposition memoranda, Plaintiffs seek leave to amend their Complaint, to the extent that the Court finds that their pleading is insufficient.  (Pls' Opp'n Mem. to Uponor at 42 [Doc. No. 25]; Pls' Opp'n Mem. to Weil-McLain at 32 [Doc. No. 27].)  Pursuant to Fed. R. Civ. P. 15(a)(1)(B), a party may amend its pleading once as a matter of course within 21 days after service of a motion under Rule 12(b).  Fed. R. Civ. P. 15(a)(1)(B).  In this case, Defendant Uponor's Motion to Dismiss was filed on September 30, 2011 [Doc. No. 16], and Defendant Weil-McLain's Motion to Dismiss was filed on September 26, 2011 [Doc. No. 16].  Plaintiffs did not file a motion to amend the Complaint within the 21-day period, nor have they filed such a motion since that time.  Plaintiffs filed their opposition memoranda, in which they alternatively seek leave to amend the Complaint, on January 6, 2012 [Doc. Nos. 25 & 27].

Although leave to amend the pleadings shall be "freely given when justice so requires," Fed. R. Civ. P. 15(a)(2), the Local Rules of this Court require a party seeking

leave to amend a pleading to file a motion seeking such relief, accompanied by a copy of

the proposed amended pleading.  L.R. 15.1(b) (2012).  Plaintiffs have not filed such a

motion, nor have they presented Defendants or the Court with a copy of their proposed

amended pleading.  In Drobnak, 561 F.3d at 787-88, the plaintiffs in a putative class

action against a window manufacturer appealed the denial of a similar informal request to

amend their complaint.   The district court addressed the plaintiffs' request in a post-

dismissal order, finding that it failed both substantively and procedurally, stating, "To the

degree that Plaintiffs' oral request was a motion, it was noncompliant because it was not

accompanied by an amended pleading or for that matter a clear representation from

counsel that any named Plaintiff's window had, in fact, been tested." Id.   The Eighth

Circuit affirmed the district court's denial of the request to amend, noting that it had

previously affirmed such denials in cases where the substance of the proposed

amendment was unclear and the local rules were not followed.  Id. at 788 (citing Meehan

v. United Consumers Club Franchising Corp., 312 F.3d 909, 913-14 (8th Cir. 2002);

Wolgin v. Simon, 722 F.2d 389, 394-95 (8th Cir. 1983)).

        The Drobnak plaintiffs also formally moved for leave to amend their complaint in

the district court after their case was dismissed for failure to state a claim.  Id. at 788.

The Eighth Circuit affirmed the district court's post-judgment denial of leave to amend:

> The proposed second amended complaint did not allege that Drobnak's or
> Markowitz's windows were tested and thus alleged no facts to support the
> conclusion that their windows failed. . . . Drobnak's and Markowitz's
> windows were uniquely within their control, and yet even the proposed
> second amended complaint offered no facts to support their individual
> allegations.

<u>Id.</u>

The Court finds <u>Drobnak</u> directly applicable.  Plaintiffs did not move for leave to amend as of right within the 21-day time period under Rule 15(a)(1)B).  Their request for leave to amend is submitted as an alternative argument in their memoranda, as opposed to a properly noticed motion.  Moreover, the request is unaccompanied by any proposed amended pleading.  No testing of Plaintiffs' pipes appears to have been performed, in any event.  Plaintiffs here are similar to the plaintiffs in <u>Drobnak</u>, who also failed to allege that the allegedly defective product had been tested.

As discussed herein, this failure to allege a defect or harm for the separate causes of action not only results in Plaintiffs' failure to state a claim upon which relief can be granted, it implicates Plaintiffs' Article III standing.  Plaintiffs have failed to demonstrate a cognizable injury sufficient to confer standing.  <u>See</u> <u>Braden</u>, 588 F.3d at 591.

Further, in addition to failing to satisfy the elements of their claims and failing to allege an injury in fact sufficient to confer standing, Plaintiffs have failed to satisfy the statutes of limitations applicable to Counts II-VIII.  Thus, permitting leave to amend the Complaint would be futile as to those specific claims.  The Court therefore denies Plaintiffs' request for leave to amend the Complaint, as the request is noncompliant with the Local Rules, Plaintiffs provide the Court with no factual support for their allegations, Plaintiffs have failed to allege an injury in fact sufficient to confer standing, and their claims in Counts II-VIII are time-barred.   Alleging a plausible injury would require Plaintiffs to test their plumbing system, which they failed to do before initiating this

litigation, and, to the Court's knowledge, have failed to do at any time since.  Even had

they done so, many of their claims are time-barred.  Accordingly, Plaintiffs' alternative

request for leave to amend their Complaint is denied.

### G.      Weil-McLain's Request for Atty's Fees

Defendant Weil-McLain moves for attorney's fees and costs pursuant to Ind. Code

§ 24-5-0.5-4(a).   This statute permits a prevailing party in a deceptive sales claim under

the IDSCA to request attorney's fees and costs, providing as follows:

> [T]he court may award reasonable attorney fees to the party that prevails in
> an action under this subsection. This subsection does not apply to a
> consumer transaction in real property, including a claim or action involving
> a construction defect (as defined in IC 32-27-3-1(5)) brought against a
> construction professional (as defined in IC 32-27-3-1(4)), except for
> purchases of time shares and camping club memberships. This subsection
> does not apply with respect to a deceptive act described in section 3(a)(20)
> of this chapter. This subsection also does not apply to a violation of IC
> 24-4.7, IC 24-5-12, or IC 24-5-14. Actual damages awarded to a person
> under this section have priority over any civil penalty imposed under this
> chapter.

Ind. Code § 24-5-0.5-4(a).

It is not clear whether this provision is applicable to the facts of this case, as the

statute expressly does not permit attorney's fees for cases involving consumer

transactions in real property, including a claim or action involving a construction defect.

In any event, without determining whether this case involves a "consumer transaction in

real property" or the sale of goods or services, or some combination, the award of

attorney's fees is discretionary.  Missi v. CCC Custom Kitchens, Inc., 731 N.E.2d 1037,

1041 (Ind. Ct. App. 2000).  Here, Defendants have moved to dismiss in lieu of filing an

51

answer and no discovery has taken place.  Furthermore, Plaintiffs' claims, while lacking

in critical respects, are not patently frivolous or groundless.  See Deadwyler v.

Volkswagen of Am., Inc., 748 F. Supp. 1146, 1154056 (W.D. N.C. 1990) (addressing fee

award statutes of several states including Indiana) (quoting Christiansburg Garment Co.

v. EEOC, 434 U.S. 412, 422 (1978), for the proposition that if a defendant prevails, he

may not automatically be awarded his attorney's fees unless the court finds the plaintiff's

claim frivolous, groundless or unreasonable).  Accordingly, Defendant Weil-McLain's

request for attorney's fees is denied.

**THEREFORE, IT IS HEREBY ORDERED** that:

1.      The Motion to Dismiss filed by Defendant Weil-McLain [Doc. No. 13] is

      **GRANTED**;

2.       The Motion to Dismiss filed by Defendant Uponor, Inc. [Doc. No. 16] is

      **GRANTED**; and

3.      The Complaint in its entirety (Counts I-XII) is **DISMISSED WITH**

      **PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  August 14,  2012                          s/Susan Richard Nelson
                                          SUSAN RICHARD NELSON
                                          United States District Judge